# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for LA JOLLA BANK, FSB,<br>　　　　　　　　　　　　Plaintiff,<br>vs.<br><br>DANNY TARKANIAN, an individual; AMY M. TARKANIAN, an individual; JERRY TARKANIAN, an individual; LOIS TARKANIAN, an individual: GEORGE TARKANIAN. an individual: ZAFRIR DIAMANT. an individual: JOSEPHINE DIAMANT. an individual: DOUGLAS R. JOHNSON. an individual: DEBRA JOHNSON. an individual; and DOES 1 through 100, inclusive,<br>　　　　　　　　　　　　Defendants. | CASE NO. 10cv980-WQH-BGS<br><br>ORDER |

DANNY TARKANIAN: AMY M. TARKANIAN: JERRY TARKANIAN: LOIS TARKANIAN: GEORGE TARKANIAN; ZAFRIR DIAMANT; JOSEPHINE DIAMANT,
　　　　　　　　　Third Party Plaintiffs,
　vs.

BEN WIGGINS: DOES I-X. inclusive: and ROE CORPORATIONS I-X, inclusive,
　　　　　　　　　Third Party Defendants.

HAYES, Judge:

　　The matter before the Court is the Motion for Summary Judgment on the Third Party Complaint filed by Third Party Defendant Ben Wiggins. (ECF No. 63).

# BACKGROUND

On May 6, 2010, Plaintiff Federal Deposit Insurance Corporation ("FDIC"), as receiver for La Jolla Bank, initiated this action by removing the Complaint from San Diego Superior Court pursuant to 28 U.S.C. § 1441(b) and 12 U.S.C. § 1819(b)(2)(B). (ECF No. 1). The original complaint filed in San Diego Superior Court alleges two causes of action against Defendants Danny Tarkanian, Amy Tarkanian, Jerry Tarkanian, Lois Tarkanian, George Tarkanian, Zafir Diamant, Josephine Diamant, Douglas Johnson, and Debra Johnson ("Defendants") for breach of guaranty on loans for which the Defendants were individual guarantors. *Id.* at 30-48.

On June 11, 2010, Defendants filed Counterclaims against Plaintiff FDIC and a Third Party Complaint against Ben Wiggins ("Wiggins"). (ECF No. 6). In the Third Party Complaint, Defendants allege causes of action against Wiggins for (1) civil conspiracy and (2) aiding and abetting deceit. *Id.* at 28-42. Defendants allege that Wiggins conspired with La Jolla Bank and Robert Dyson "to wrongfully encumber [Defendants'] real properties and to shore up La Jolla Bank's somewhat shaky financial posture by using the Johnson Investments and the Vegas Diamond loan proceeds to repay Mr. Dyson's loans from La Jolla Bank," and that Wiggins "aided Mr. Dyson [and La Jolla Bank] in their actions to wrongfully obtain funds from [Defendants]." *Id.* at 40-41.

On November 21, 2011, Wiggins filed a Motion for Summary Judgment seeking judgment in his favor on the Third Party Complaint. (ECF No. 63). On December 13, 2011, Defendants filed an opposition. (ECF No. 72). On December 20, 2011, Wiggins filed a reply. (ECF No. 80).

On January 5, 2012, the Court dismissed Douglas Johnson and Debra Johnson as third party plaintiffs for failure to substitute counsel. (ECF No. 83). On April 17, 2012, the Court dismissed the counterclaims against Plaintiff FDIC after Plaintiff FDIC showed entitlement to judgment as a matter of law pursuant to 15 U.S.C. § 1823(e). (ECF No. 100).

///

///

**UNDISPUTED FACTS**

Vegas Diamond Properties, LLC ("Vegas Diamond") and Johnson Investments, LLC ("Johnson Investments") each owned property in Las Vegas, Nevada. Defendants Danny Tarkanian, Amy Tarkanian, Jerry Tarkanian, Lois Tarkanian, George Tarkanian, Zafir Diamant, and Josephine Diamant are the principals of Vegas Diamond. Defendants Douglas and Debra Johnson are the principals of Johnson Investments.

Vegas Diamond and Johnson Investments took out loans with La Jolla Bank totaling over $25 million, secured by their respective properties, and loaned the proceeds to developer Robert Dyson to be used for a real estate project in Anza, California. The Johnsons personally guaranteed the loan to Johnson Investments. Defendants Tarkanians and Diamants personally guaranteed the loan to Vegas Diamond. The ability of Vegas Diamond and Johnson Investments to repay their loans from La Jolla Bank was dependent on the ability of Dyson to repay his loans from Vegas Diamond and Johnson Investments.

Dyson was unable to repay the loans from Vegas Diamond and Johnson Investments. Defendants' respective properties were foreclosed upon in March 2011.

In support of his motion for summary judgment, Wiggins submitted a signed declaration stating that:

> 2. I was an independent contractor who provided services to the companies owned by Robert Dyson. I was not Mr. Dyson's accountant or bookkeeper. At the request of both Mr. Dyson and Danny Tarkanian, I sometimes acted as a go-between, including sometimes transmitting messages, delivering documents and obtaining signatures. I also prepared worksheets and paperwork related to the Anza Project which were requested by Mr. Dyson and Mr. Tarkanian. However, at no time did I knowingly conceal any facts or make any false statements.
>
> 3. I was not present nor involved in any discussions or negotiations between Mr. Tarkanian, Mr. Dyson and La Jolla Bank. I did not negotiate with La Jolla Bank or anyone else. I never did any work for La Jolla Bank. I did not conduct or participate in any loan negotiations on behalf of anyone. I did not restructure any loan for Mr. Johnson or anyone else. I did not participate in any decision making relating to Mr. Dyson's business, La Jolla Bank's business, Third Party Plaintiffs' business, or the Anza Project.
>
> 4. I did not act knowingly to conceal or misrepresent anything, did not conspire with anyone, and did not commit any acts in furtherance of any common design.
>
> 5. In addition, based upon my conversations with Mr. Johnson, Mr. Tarkanian and Mr. Dyson, it was apparent to me that the true facts relating to the loans on

the project, the use of loan proceeds, the delays with the project, the political climate in the Anza Valley, and all the other matters Third Party Plaintiffs allege constituted wrongful concealment, were actually known by Mr. Tarkanian and/or his legal counsel at the time.

(Wiggins Declaration; ECF No. 63-3).

Robert Dyson gave the following deposition testimony in this case:

Q. ... What was your relationship – or what is your current relationship with Mr. Wiggins?
A. He still does – well, he doesn't now. We have someone else doing the accounting. Our relationship pretty much are friends and I counsel with him on occasion.
Q. ... between, let's say, 2001 and October 30, 2008, what was your relationship with Mr. Wiggins?
A. Very active. He was instrumental in preparing us in various activities in our real estate operation.
Q. Can you be more specific?
A. He comes more from the accounting side. I come from the marketing side. So he – he brought that – those talents to the table in various projects that we worked on.
...
A. ... he managed our money and did a significant amount of reporting.
...
Q. Was Mr. Wiggins your personal tax accountant?
A. He's not an accountant.
Q. ... What is his professional background?
A. Um, he has a degree, I believe, in accounting. And I think you will have to ask him as far as that's concerned. He just did a great job for us.
...
Q. So if you were going to give me some advice... where I would go to get those disbursement instructions, where would you send me?
A. Again, Ben Wiggins handled our accounting, so I would that [sic] if he had any records...
...
Q. Now, Mr. Wiggins, he owned a company called Master Management?
A. Master Management.
...
Q. This was his company?
A. Yes, sir.
Q. What type of company was it?
A. I don't know. I mean, it was accounting.
...
Q. ... What type of business?
A. It was an accounting business. He did a lot of our accounting and fund control.
Q. Was he a CPA?
A. No, sir.
Q. Did you have a CPA working for him?
A. No, I think he just – clients had their own CPAs and he furnished data.
Q. More of a bookkeeper type?
A. Yes.

(Dyson Deposition Transcript; ECF No. 72-1).

Danny Tarkanian, main principal of Vegas Diamond, submitted a signed declaration in opposition to Wiggin's motion for summary judgment, stating that:

> 5. Beginning in 2007, during the course of dealings leading up the loan transaction [between La Jolla Bank (hereinafter "LJB") and Vegas Diamond], Defendant, Ben Wiggins (hereinafter "Mr. Wiggins") was directly involved in all aspects of the loan transaction on a day to day basis on behalf of Mr. Dyson.
>
> 6. Mr. Wiggins was the point of contact for Mr. Dyson.
>
> 7. Mr. Wiggins was involved in virtually every meeting which was held between Vegas Diamond and Mr. Dyson.
>
> 8. Mr. Wiggins was acting as a chief financial officer and accountant for Mr. Dyson throughout the course of dealing on the loan transaction.
>
> 9. Mr. Wiggins provided Mr. Dyson's financial documents to Vegas Diamond.
>
> 10. In providing Vegas Diamond the financial documents, Mr. Wiggins reviewed the financial documents with Vegas Diamond and explained them to Vegas Diamond.
>
> 11. In reviewing and explaining the financial documents of Mr. Dyson to Vegas Diamond, Mr. Wiggins emphasized the financial strength of Mr. Dyson and always made it look as though Mr. Dyson had a lot of money.
>
> 12. Mr. Wiggins often informed Vegas Diamond that LJB was requesting certain documents or other paperwork from Vegas Diamond.
>
> 13. Mr. Wiggins often reworked the financial paperwork of Vegas Diamond saying this is how it is to be done as required by LJB.
>
> 14. Mr. Wiggins would collect the documents and other paperwork which were requested by LJB and delivered them to LJB.
>
> 15. Mr. Wiggins inferred that he had been involved in the project in Anza, California for a long time with Mr. Dyson.
>
> 16. Mr. Wiggins told Vegas Diamond about the project in Anza, California, and told Vegas Diamond how exciting the project was and the great potential and prospects it had.
>
> 17. Mr. Wiggins made representations that the project in Anza, California was a great investment.
>
> 18. Mr. Wiggins never informed Vegas Diamond of any real problems with the project in Anza, California and minimized the impact and extent of any problems he may have disclosed.
>
> 19. Mr. Wiggins never informed Vegas Diamond that there were problems with the political climate in Anza which was against the project, and there was opposition from the local Native Americans against the project.
>
> 20. Mr. Wiggins discussed that there was a water right issue, but minimized any adverse impact of the issue by producing reports showing there was sufficient

water.

21. Mr. Wiggins never informed Vegas Diamond that the problems with the project in Anza, California were present prior to 2005.

(Tarkanian Declaration; ECF No. 72-2).

## STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Celotex*, 477 U.S. at 322, 324. To avoid summary judgment, the opposing party cannot rest solely on conclusory allegations of fact or law. *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, the nonmovant must designate which specific facts show that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in their favor. *See id; see also Matsushita,* 475 U.S. at 587 (holding that any inferences from the underlying facts must be viewed in light most favorable to the non-moving party).

## DISCUSSION

Wiggins denies acting knowingly to conceal or misrepresent any facts, conspiring with anyone, or committing any acts in furtherance of any common design. Wiggins asserts that he was an independent contractor hired by Dyson to provide limited financial services and that he did not participate in any loan discussions, negotiations, or decision-making.

Defendants assert that Wiggins was intimately involved with loan negotiations and Dyson's finances. Defendants assert that "Wiggins was certainly positioned to substantially assist and encourage his good friend despite knowing that Dyson was not being honest and forthcoming with [Defendants]." (ECF No. 72 at 14). Defendants assert that "Wiggins actively pushed for the Vegas Diamond loan without mentioning a word of these difficulties [with the Anza project] to [Defendants]." *Id.* at 15.

Under California law, the elements of civil conspiracy are "(1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages." *City of Industry v. City of Fillmore,* 198 Cal.App.4th 191, 212 (2011). Civil conspiracy is not an independent tort. *Id.* at 211. "A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 511 (1994) (citations omitted); *See also Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.,* 131 Cal.App.4th 802, 823 (2005) ("[civil conspiracy] is not itself a substantive basis for liability."). "By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." *Applied Equipment,* 7 Cal.4th at 511.

Similarly, liability for aiding and abetting the commission of an intentional tort may be imposed upon a person who "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Neilson v. Union Bank of California, N.A.,* 290 F.Supp.2d 1101, 1118 (2003) quoting *Saunders v. Superior Court*, 27 Cal.App.4th 832, 846 (1994). "[W]hile aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Howard v. Superior Court,* 2 Cal.App.4th 745, 749 (1992). "[L]iability [for

aiding and abetting] attaches because the aider and abettor behaves in a manner that enables the primary violator to commit the underlying tort." *Neilson,* 290 F.Supp.2d at 1134.

Defendants have not alleged that any independent tort was committed by Wiggins. The tort counterclaims against Plaintiff FDIC have been dismissed. No claims have ever been filed against Robert Dyson. Defendants have failed to establish that any intentional tort or wrongful act was committed by Wiggins, the FDIC as receiver for La Jolla Bank, or Dyson. Defendants have not shown that any civil wrong has been committed by any party or that any duty was owed to Defendants by Wiggins. *See Applied Equipment,* 7 Cal.4th at 511. Defendants have failed to come forward with evidence to support their claims against Wiggins. Accordingly, Wiggins is entitled to summary judgment.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment on the Third Party Complaint filed by Third Party Defendant Ben Wiggins (ECF No. 63) is GRANTED as to the third party claims filed by Defendants Danny Tarkanian, Amy Tarkanian, Jerry Tarkanian, Lois Tarkanian, George Tarkanian, Zafir Diamant, and Josephine Diamant.

DATED: May 3, 2012

**WILLIAM Q. HAYES**
United States District Judge